**NORTHROP GRUMMAN CORPORATION, successor in interest to Grumman Space Station Integration Division, Appellant,**

v.

**Daniel S. GOLDIN, Administrator, National Aeronautics and Space Administration, Appellee.**

**No. 97–1288.**

United States Court of Appeals, Federal Circuit.

Feb. 26, 1998.

Michael C. Poliner, Feith & Zell, P.C., Washington, DC, argued for appellant. With him on the brief was J. William Eshelman. Of counsel on the brief was Paul C. Burkholder, Senior Counsel, Northrop Grumman Corporation, Law Department, Los Angeles, CA.

Laureen D. Kapin, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued for appellee. With her on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director. Of counsel on the brief was David Gayle, Attorney, Office of Chief Counsel, National Aeronautics & Space Division, NASA Headquarters, Washington, DC.

Before RICH, LOURIE, and BRYSON, Circuit Judges.

LOURIE, Circuit Judge.

Northrop Grumman Corporation appeals from the decision of the Armed Services Board of Contract Appeals denying its claim under a cost-plus-award-fee contract for payment from funds allocated to a "separate award fee pool." *Grumman Space Station*

*Integration Div.,* 97–1 BCA ¶ 28,843, ASBCA No. 48,719, 1997 WL 103316 (1997). The Board held that since NASA terminated the contract early, Northrop was not entitled to certain funds remaining in the "separate award fee pool." Because the Board erred in construing the contract to preclude payment from the separate award fee pool in the event of an early termination, we reverse.

## BACKGROUND

Northrop contracted with NASA to render services for NASA's space station program on a cost-plus-award-fee basis. Under such a contract, a contractor is reimbursed for its costs and receives a profit, or fee, equal to a percentage of its costs. Under the original contract, Northrop and NASA estimated on an annual basis the costs expected to be incurred over the following year, called a performance period. NASA allocated an amount equal to 9% of the estimated costs for the performance period to an award fee pool. This pool represented the maximum fee available to Northrop for the year. Each performance period was divided into two 6–month evaluation periods, and the funds in the award fee pool were divided equally between each evaluation period. After each evaluation period, NASA evaluated Northrop's performance during the preceding 6 months and awarded Northrop a percentage of the funds from the award fee pool allocated to that evaluation period. Funds in the award fee pool did not accumulate from one evaluation period to the next; any funds not paid to Northrop at the end of an evaluation period were lost.

As a result of a contract modification, the contract was restructured to provide, among other things, a maximum award fee of 8.5% of the expected costs. In addition, the award fee pool was split into two pools: 7.5% was allocated to the basic award fee pool and 1.0% was allocated to a separate award fee pool. Funds in the basic pool, like the original pool, were distributed based on NASA's evaluation of Northrop's performance at the conclusion of each evaluation period. The basic pool, like the original pool, was emptied at the end of each evaluation period. If Northrop performed poorly during an evalu-

ation period, earning, for example, a rating of 10%, Northrop could not apply the undistributed 90% portion to the next evaluation period. The unearned funds would be lost.

Funds in the separate pool, however, were not awarded at the end of each evaluation period. Rather, they accumulated over successive evaluation periods and were awarded after Northrop reached milestones designated at the discretion of NASA. When a milestone was designated, NASA was to assign a portion of the funds in the separate pool to that milestone. After the milestone was reached, Northrop's performance was to be evaluated and a percentage of the designated funds awarded. The remaining percentage of the designated funds was to be lost. Those funds not assigned to a milestone, the undesignated funds, remained in the separate pool, available for future designation.

Because NASA had discretion in designating milestones and in awarding dollar values to those milestones, it was possible that little or no money would be designated from the separate pool. As a result, Northrop would not have had an opportunity to earn through milestone achievements all or most of the funds in the separate pool. In order to prevent excessive accumulation of funds in the separate pool, the contract accordingly provided Northrop with an opportunity to earn at least 50% of the funds in the separate pool every four consecutive evaluation periods. If less than 50% of the funds were designated during four consecutive evaluation periods, 50% of the separate pool would be shifted into the basic pool. Finally, the contract provided that any funds left in the separate pool at the end of the final performance period would be shifted to the basic pool. At the contemplated conclusion of the contract, Northrop would thus earn a percentage of all remaining undesignated funds in the separate pool based on NASA's evaluation of Northrop's performance during the last two evaluation periods.

The pertinent provisions of the contract modification that established the separate award fee pool read as follows:

 B. This pool is intended to be evaluated and made available for award to the Contractor as a function of the Contractor's

performance contributing to achievement of significant or major Space Station Freedom Program milestones, critical events, and/ or major program initiatives.

\* \* \* \* \* \*

C. When one or more milestones are selected by NASA, the milestone(s) will be specified by the NASA Contracting Officer in writing to the Contractor at the beginning of an evaluation period along with the award fee value assigned. The Contractor may also suggest specific milestones for possible evaluation. The evaluation procedure is the same as that used for the regular award fee determination. . . .

D. One or more milestones will be designated for evaluation at least once every four consecutive evaluation periods. At least 50% of the cumulative available award fee must have been designated for use within the same time span. If no milestones or events have been identified for evaluation within this timespan, 50% of the balance in this separate fee pool will be assigned to the basic award fee pool for the corresponding evaluation period.

\* \* \* \* \* \*

F. Unearned fee from the separate award fee pool will not be made available for use in future evaluation periods.

G. Any undesignated amounts in the separate award fee pool not evaluated will be assigned to the basic award fee pool for the final performance period of the contract (i.e., evaluation periods 27 and 28).

The contract also incorporated by reference the standard termination clause from the Federal Acquisition Regulations which provided:

If the contract is terminated for the convenience of the Government, the settlement shall include a percentage of the fee equal to the percentage of completion of work contemplated under the contract, . . . less previous payments for fee.

48 C.F.R. § 52.249–6(h)(4)(i) (1997).

Well before the scheduled conclusion of the contract, during evaluation period 13, NASA notified Northrop that it was terminating the contract for convenience. Northrop calculat-

ed, and NASA does not dispute, that the separate pool contained $1,630,792 in undesignated funds at that time. These funds had accumulated over the course of performance, but NASA had not designated the funds for any milestone tasks. Thus, Northrop did not have a chance to "earn" the funds by performing milestone tasks. Northrop asserted that in accordance with paragraph G of the contract modification, NASA was required to transfer the balance of the separate pool into the basic pool in calculating the final payment under the contract. NASA contended that paragraph G only applied if the contract terminated as originally scheduled, after evaluation period 28. Finding no provision of the contract applicable, NASA denied Northrop's request for payment from the separate pool. Northrop submitted a certified claim for breach of contract. After the contracting officer denied the claim, Northrop appealed to the Board.

On cross-motions for summary judgment, the Board sustained the denial of the claim. Relying on the parenthetical reference in paragraph G, the Board concluded that the contract was not ambiguous and that the only reasonable interpretation of the contract is that undesignated funds within the separate award fee pool are not payable upon early contract termination. Northrop timely appealed the Board's decision to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(10) (1994).

## DISCUSSION

The pertinent facts are undisputed. Since there are no genuine issues of material fact, summary judgment was appropriate. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The sole issue on appeal is whether the Board properly interpreted the contract, a question of law which we review *de novo. See* 41 U.S.C. § 609(b) (1994) ("The decision of the agency board on any question of law shall not be final or conclusive."); *Aydin Corp. v. Widnall,* 61 F.3d 1571, 1577 (Fed.Cir.1995). However, while not binding on the court, "a Board's interpretation of a contract will be given careful consideration and accorded great re-

spect." *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985).

Contract interpretation begins with the plain language of the agreement. *See Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). We must construe a contract so as "to effectuate its spirit and purpose" and to give "reasonable meaning to all of its parts." *Id.* A contract is thus to be interpreted as a whole. *See Granite Constr. Co. v. United States,* 962 F.2d 998, 1003 (Fed.Cir.1992).

Northrop argues that it is entitled to a percentage of the separate pool, asserting that the contract was structured so that Northrop was eligible to earn the entire 8.5% fee (assuming perfect performance) which was split between the basic and the separate pools. It asserts that the Board erred by not reforming the contract to correct a mistake in drafting, and further argues that even absent reformation, the contract should be construed to give effect to the uncontroverted intent of the parties. Northrop concedes that the contract does not explicitly state how the separate pool should be treated in the event of an early termination. Nonetheless, it argues that it is unreasonable to interpret the contract as allocating the separate pool to NASA.

NASA responds that the Board correctly determined that the contract does not provide for payment from the separate fund in the event of early termination. NASA argues that, with the exception of paragraphs D and G, funds in the separate pool may only be earned by Northrop's meeting established milestones. NASA asserts that because Northrop did not perform work related to any of the milestones, Northrop cannot obtain the funds in the separate pool.

We agree with Northrop that under the only reasonable interpretation of the contract as a whole, the funds in the separate pool were to be transferred to the basic pool in the event of either scheduled or early termination. The termination clause, incorporated by reference, leads to the conclusion that the funds in the separate pool belong to Northrop. In the event of a termination for convenience, the termination clause states that Northrop is entitled to "a percentage of the fee equal to the percentage of completion of work." Under the termination clause, Northrop is eligible to earn a fee that relates to the work actually performed. The separate pool is no less part of that fee than the basic pool.

NASA argues that the Board correctly concluded that the funds in the separate pool relate to unperformed milestone tasks and are thus anticipatory profits. We disagree. The funds in both the basic and separate pools accumulated in direct proportion to work already performed prior to the termination for convenience. The total amount accumulated in the separate pool before disbursements equaled 1% of the costs associated with work actually completed. There is therefore no principled reason to treat the separate pool as being different from the basic pool in this respect.

NASA's contention that Northrop only "earns" the funds in the separate pool by reaching milestones is mistaken. The separate pool was not a "bonus" which was earned only upon meeting discretionary milestones. The funds in the separate pool were part of the overall fee awarded in the contract. Under the contract, NASA effectively held back the funds in the separate pool beyond the period for which they accrued so that the funds could be used as an incentive for work yet to be performed. Although evaluation and payment from the separate pool was delayed to motivate Northrop to perform certain tasks particularly well, the funds in that pool were already earned subject to a performance evaluation and the pool grew in proportion to the work actually completed. Under NASA's theory, it could have kept a large percentage of the funds in the separate pool by refusing to set milestones and then terminating the contract early, even if only one day early. This plainly is not consistent with the spirit and purpose of the contract, which awarded Northrop a fee of up to 8.5% of costs based on performance.

NASA argues that the undesignated funds in the separate pool are fundamentally different from the funds in the basic pool. Specifically, NASA contends that Northrop's entitlement to the balance in the separate

pool is precluded by paragraph G of the contract modification. Paragraph G states that any undesignated funds in the separate pool will be assigned to the basic pool "for the final performance period of the contract (i.e., evaluation periods 27 and 28)." Northrop asserts that this provision, when read in the context of the entire contract, plainly contemplated a transfer of the balance of the separate pool to the basic pool at the termination of the contract, whenever that occurred. NASA responds that the term "final performance period" in paragraph G is defined by the parenthetical reference. It argues that the use of the term "i.e." clearly and unambiguously means "that is" as opposed to "e.g.," which means "for example." According to NASA, the term "final performance period" may only be interpreted as the final scheduled performance period (corresponding to evaluation periods 27 and 28), and cannot correspond to the final period of performance resulting from early termination.

We do not agree with NASA that the use of the term "i.e." in paragraph G conclusively indicates that the term "final performance period" is to be interpreted as meaning "evaluation periods 27 and 28" to the exclusion of any other pair of evaluation periods. The premise of NASA's argument is that the parenthetical reference unambiguously "defines" the preceding term. We disagree. Although we agree with NASA's translation of the Latin abbreviations, those meanings are not conclusive in light of the contract as a whole.[1] The parenthetical reference does not clearly indicate whether the term "final performance period" means "only periods 27 and 28" or more loosely illustrates the expected final evaluation periods.[2] The termination clause does answer this question because it awards Northrop a fee corresponding to the percentage of work performed, and the separate fund represents work performed. The contract clearly

states that Northrop would earn the funds in the separate pool via transfer to the basic pool even if NASA set no milestones. Under paragraph D, a portion of the accumulated undesignated funds is to be assigned to the basic pool every four evaluation periods. Under paragraph G, the balance of the undesignated funds is to be assigned to the basic pool for the final performance period.

Reading the clear termination clause in conjunction with the inconclusive paragraph G, the term "final performance period" therefore must mean the last performance period before the contract is terminated, rather than the last performance period contemplated if the contract went to its completion. It is clear that if the contract had proceeded to full term, Northrop would have been eligible to earn all the funds in the separate pool, either through meeting milestones or through the transfer of funds to the basic pool. If the contract were to have been completed as scheduled, there was no scenario under which undesignated funds (those not related to a milestone) would automatically revert to NASA. That is not to say that Northrop would have been entitled to all the funds in the separate pool. Northrop earned a percentage of the designated funds based on an evaluation of Northrop's performance in reaching designated milestones. If Northrop performed poorly in reaching a milestone, it would lose a percentage of the designated funds associated with that milestone. Thus, when NASA terminated the contract for convenience, it was required to assign the balance of the separate pool to the basic pool. Any other reading would allow NASA to essentially reclaim a portion of the fee corresponding to work already performed. Accordingly, the Board erred by holding otherwise.

 Northrop urges us to determine as a matter of law that it is entitled to 91% of the

---

1. Although, as the Board noted, Black's Law Dictionary indicates that there is only one "acceptable" meaning of "i.e.," we regrettably recognize that contract drafters sometimes use the terms "i.e." and "e.g." imprecisely. In fact, the Contracting Officer in this case testified that she understood the term "i.e." to mean "for example."

2. We find it unnecessary to "reform" the contract to correct the apparent mutual drafting mistake, as contemplated by the Restatement (Second) of Contracts § 155 (1981). Northrop concedes that the provision was not drafted with an early termination in mind.

separate pool, or $1,484,021. Its reasoning is that, under paragraph G, the balance of the separate pool is to be awarded based on the final two evaluation periods, which were periods 12 and 13. However, the parties agreed not to perform an evaluation for period 13 because the contract was terminated two months into that period. Thus, Northrop asserts that payment should be based solely on period 12, for which Northrop earned a score of 91%. NASA does not directly respond to Northrop's argument. In its brief, NASA argues that remand is appropriate, but only makes the vague assertion that the Board would have to find the facts to determine "the precise amount [Northrop] would be entitled to under the contract." When questioned at oral argument, NASA stated that the Board "would have difficulty" determining the appropriate percentage, and that it was unclear how such a determination would be made. NASA did not indicate which facts were in dispute and in need of resolution.

Under these circumstances, we accept Northrop's approach as the soundest practical course of action. The scores earned by Northrop through evaluation period 12 are undisputed, and pursuant to a settlement, the parties declined to evaluate period 13. They agreed to a fixed fee arrangement for the basic pool, because in NASA's words, "it became a practical impossibility to perform an award fee evaluation for the truncated 13th fee evaluation period." Furthermore, NASA does not argue that the final evaluation periods were 11 and 12. To require the Board, four years after contract termination,

to estimate what score Northrop would have received had an evaluation of the truncated 13th period been performed would be wasteful and costly. Nor would such an exercise be likely to yield a score much more accurate than that determined by using the approach suggested by Northrop. In light of the parties' settlement regarding evaluation period 13, which was conditioned on Northrop's right to pursue this appeal, NASA in effect waived any right to request an evaluation of Northrop's performance for period 13. Accordingly, Northrop's proposal to base payment solely on period 12 provides the soundest means for resolving this dispute; it is entitled to 91% of the balance remaining in the separate award fee pool.

## CONCLUSION

At the time the contract was terminated, the balance in the separate award fee pool was undesignated, and thus it should have been assigned to the basic pool. Accordingly, the grant of NASA's motion for summary judgment and the denial of Northrop's motion for summary judgment are reversed. Northrop is entitled to 91% of the balance in the separate award fee pool, i.e., $1,484,021.

*REVERSED.*