**PETE VICARI GENERAL CONTRACTOR, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00-337C.

United States Court of Federal Claims.

Dec. 6, 2001.

Stephen J. Caire, Metairie, LA, for plaintiff.

James W. Poirier, Washington, DC, with whom were Stuart E. Schiffer, Acting Assistant Attorney General, and Director David M. Cohen, for defendant.

## OPINION

FIRESTONE, Judge.

This contract dispute comes before the court on the government's motion for partial summary judgment and the plaintiff's motion for summary judgment. The case arises over a contract entered into in 1998 between the United States Navy ("Navy") and Pete

Vicari General Contractor, Inc. ("Vicari" or "the contractor"). The contract provided for construction of facilities at the Naval Air Station in New Orleans, Louisiana. In its motion for summary judgment, Vicari asserts that the government owes the contractor delay damages for improperly refusing to allow Vicari to timely proceed with the second phase of the contract. Vicari also seeks an equitable adjustment for costs it alleges it incurred in performing engineering work that was to have also been performed by the government. In its motion for partial summary judgment, the government argues that, as a matter of law, the government did not delay the contract, and thus Vicari is not entitled to delay damages. The government also argues that there are facts in dispute which preclude summary judgment on Vicari's claim for reimbursement of costs attributable to performing the disputed engineering services.

For the reasons that follow, the court grants the government's motion for partial summary judgment with regard to Vicari's claims for delay damages in Counts I and II and denies the plaintiff's motion for summary judgment on Counts I and II. Plaintiff's motion for summary judgment on Count III is granted in part and denied in part.

## FACTS

### I. Background

#### A. The Contract

The following facts are not in dispute. On May 21, 1998, the Navy entered into Contract No. N62467–96–C–0969 with Vicari for the construction of a Base Civil Engineering and Communications Complex at the Naval Air Station in New Orleans, Louisiana. The contract award price was $6,011,823. The contract called for the work to be completed in three phases: Phases A, B, and C. The contract also provided a timeline for the completion of each of the phases: for the completion of Phase A, the contractor was to schedule 210 days from the notice to proceed; for Phase B, the contractor was to schedule 365

days from the completion of Phase A; and for Phase C, the contractor was to schedule 271 days from the completion of Phase B. The Navy issued the notice to proceed on June 5, 1998.

Partway into the contract performance period, a modification was entered extending the completion dates for the three phases of the contract because of heavy rains in August and September 1998.[1] Eleven days were added to the schedule, making the projected completion date for Phase A January 13, 1999, the completion date for Phase B January 13, 2000, and for Phase C October 30, 2000.

At issue in this litigation is the work required in Phase A of the contract. Phase A required Vicari to prepare the construction site by clearing, grubbing, draining, filling, compacting, and leveling the site in advance of the start of actual construction work. More specifically, the dispute in this case centers on the part of the contract dealing with the required compaction of the work site, a key component of Phase A. This compaction, or "densification," was to be achieved through the placement of "surcharge" or "fill," a layer of soil placed on top of the work site, the weight of which would compress the soil below it in preparation for its use as the foundation for the construction project. Section 02229 of the contract, titled "Surcharge Placement," detailed the tasks to be completed by Vicari in this phase of the contract.

The following are the relevant provisions of the contract between Vicari and the Navy concerning the now-disputed surcharge monitoring process:

Section 02229–SURCHARGE PLACEMENT[2]

. . .

PART 1 GENERAL

. . .

1.3 SUBMITTALS

Submit the following in accordance with Section 01300, "Submittals."

. . .

---

1. Modification P00002 issued on January 14, 1999.

2. This section of the contract was amended via Amendment 0001 issued February 27, 1998.

#### 1.3.2.1 Densification Procedures

Submit procedures for surcharge placement, wick drain and horizontal strip drain placement. Monitoring and scheduling to assure the adequate consolidation is to be preformed [sic] by a registered Geotechnical Engineer.

. . .

#### 1.3.4.2 Settlement Plate Logs

Submit log to include settlement plate elevations at the beginning and upon completion of fill placement and weekly thereafter for a minimum of 120 days or until additional settlement is expected to be less than ½ inch.

### 1.4 REQUIREMENTS

. . .

#### 1.4.2 Wick Drains

At all areas of surcharge indicated on the drawings, provide wick drains spaced at a 5 foot on-center triangular pattern to a depth of 60 feet below existing grade as outlined in paragraph entitled "Wick Drain Placement" later in this section. Contractor shall schedule placement of wick drains, strip drains and fill placement a minimum of 180 calendar days prior to the start of any foundation work

. . .

### 1.5 QUALITY ASSURANCE

#### 1.5.1 Surcharge Placement

#### 1.5.1.1 Monitoring Program

The actual duration of the surcharge will depend on the observed rate of consolidation of the subsurface soils. Instrumentation used to monitor the surcharge should consist of settlement plates and pore pressure transducers. The Contractor is to retain a registered Geotechnical Engineer to monitor and evaluate data from these instruments. Settlement plates and pore pressure transducers are to be monitored on a bi-weekly basis to provide sufficient data for evaluation. . . .

#### 1.5.1.2 Settlement Plates

A minimum of 6 settlement plates are [sic] to be installed at each building loca-

tion. Data collected from the settlement plates will be used to verify or revise the estimated rate of settlement. Settlement plates need to be installed by the Contractor at the Geotechnical Engineer's direction with zero readings established by the Geotech prior to placement of the preload fill.

. . .

### PART 3 EXECUTION

. . .

#### 3.2.3 Settlement Monitoring

After site preparation and wick drain placement and prior to surcharge and placement, install settlement plates as prefiously [sic] indicated. . . . The Owner's Geotechnical Engineer will survey the elevation of all settlement plates immediately after installation (immediately after wick drain placement), and weekly after completion of structural fill and surcharge. Upon completion of fill placement, the site shall be allowed to consolidate until the settlement plate data indicates additional settlement will be less than ½ inch. Contractor shall schedule a minimum of 180 days for this process. Do not proceed with foundation work in these areas until the Geotechnical Engineer has verified in writing that the consolidation process is complete and the approval of the Contracting Officer is obtained.

. . .

An additional part of the contract, Section 01300, provided more specificity regarding the requirements and timelines for the submittals required of Vicari during the construction project. In some cases, Vicari was required to receive the Navy's clearance before performing certain tasks.[3]

Section 01300–SUBMITTALS

. . .

### 1.3 PROCEDURES FOR SUBMITTALS

. . .

#### 1.3.3 Scheduling

a. Coordinate scheduling, sequencing, preparing and processing of submit-

---

**3.** See *supra* contract section 02229, paragraph 1.3.

tals with performance of the work so that work will not be delayed by submittal processing. Allow for potential requirements to resubmit.

b. Except as specified otherwise, allow a review period, beginning with receipt by the approving authority, that includes at least 15 working days for submittals for QC Manager approval and 20 working days for submittals for Contracting Officer approval. . . .

## B. Vicari's Work Under the Contract

Vicari mobilized on the job site on July 20, 1998 (forty-five days after the notice to proceed was given), and began surveying, clearing, and grubbing the site. A subcontractor began installing the vertical and horizontal wick drains on August 31, 1998. The dewatering system that would drain the site was entirely installed by September 5, 1998. Prior to placing structural fill on the site, Vicari completed the installation of the settlement plates by October 19, 1998, and Kerwin Julien, the geotechnical engineer working on behalf of Vicari's subcontractor Citywide Testing & Inspection Services, Inc. ("Citywide") surveyed the initial elevation readings on that day.

At approximately the same time, on October 14, 1998, Vicari wrote to the Navy's contracting officer ("CO") seeking clarification regarding how long the Navy expected it would take the contractor to achieve the ½ inch settlement goal. This inquiry, deemed Request for Information Number 9 ("RFI 9"), inquired as follows: "Specification section 02229 [paragraph] 3.2.3 states that the surcharge area shall be allowed to consolidate until plate data indicates additional settlement will be less than ½ inch. Would you please clarify the time frame of less than ½ inch?" On October 15, 1998, Eustis Engineering, the geotechnical engineering subcontractors to the Navy's project architects, KBJ Architects, provided the response to RFI 9: "As previously indicated, the duration of the surcharge will depend on the

observed rate of consolidation as determined by evaluation of the data collected from the settlement plates and pore pressure transducers."

The first settlement plate readings with the surcharge in place were recorded on November 16, 1998, and readings were subsequently taken every two weeks. In early January 1999, Vicari claimed that it should be allowed to proceed to Phase B of the contract because the rate of settlement had slowed to less than ½ inch *per week*. Vicari made its first request to proceed on January 8, 1999, and reiterated this request on January 13, 1999. In both instances, the Navy's CO refused permission, and directed Vicari to keep the surcharge in place so that the compaction could continue.

On January 17, 1999, Vicari's subcontract geotechnical engineer, Kerwin Julien, presented his first report to Citywide summarizing the settlement plate data and the degree and rate of compaction at the work site. He provided his second report on March 1, 1999. The second report included data recorded through February 22, 1999, and concluded as follows: "Incremental settlement has decreased to 0.44 inches (7/16″) for the last two-week period reading in each building. . . . The amount of settlement appears to be rapidly approaching the amount estimated in Eustis' report.[4] No known adverse conditions appear to be affecting settlement. Continued monitoring of settlement is recommended."

On behalf of the Navy, Eustis Engineering also kept tabs on the densification process during the course of performance. After reviewing the data provided by Julien on March 1, 1999, as well as some additional data from March 9, 1999, Eustis reported to the Navy's architects on March 15, 1999, that Eustis believed the site would experience "approximately 1 to 2 inches of residual settlement" if the surcharge were to be removed at that time. Eustis therefore recommended that the surcharge "remain in place and data continue to be obtained on a biweekly basis and forwarded for review." Despite this ad-

---

4. In September 1996, as part of the early planning process for the project, the Navy asked Eustis to prepare a Geotechnical Investigation for the Base Civil Engineering and Communications Complex.

vice, the Navy decided to allow the contractor to move forward. The Navy's CO gave Vicari permission to proceed to Phase B of the contract on March 16, 1999.

## II. Procedural Posture

### A. The Certified Claim

On May 7, 1999, Vicari submitted a claim for an equitable adjustment to the Navy. In it, Vicari requested compensation for sixty-two days of delay for the Navy's refusal to allow Vicari to proceed to Phase B of the contract in January 1999, after it believed had achieved the ½ inch "rate" of compaction called for in the specifications.[5] The contractor also sought costs associated with Vicari's having taken over the monitoring and data collection responsibilities identified in section 3.2.3 of the contract, responsibilities it alleged it was supposed to have shared with the government.

The Navy denied Vicari's request on June 23, 1999. On July 29, 1999, Vicari submitted a certified claim to the Navy's CO, once again seeking equitable adjustments in the price and schedule under the contract. No final decision was ever issued. Vicari then filed suit in this court under Federal Acquisition Regulations section 33.211(g), treating the Navy's failure to respond as a deemed denial of its claims.

### B. This Litigation

Vicari initiated this litigation with its complaint on June 6, 2000. In it, Vicari makes the following two claims for damages: 1) Vicari claims that it is entitled to damages for the sixty-two day delay allegedly caused by the government's refusal to allow Vicari to proceed with Phase B of the contract as required; and 2) Vicari seeks reimbursement for its provision of geotechnical services under section 3.2.3 of the contract.[6]

This matter is now before the court on the parties' cross motions for summary judgment. The government filed its motion for partial summary judgment on May 15, 2001, and the plaintiff filed its cross motion for summary judgment on August 29, 2001. The parties submitted supplemental briefs, and oral argument was heard on November 20, 2001.

## DISCUSSION

### I. Standard of Review

This case turns on questions of contract interpretation that are properly before this court on motions for summary judgment. *Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir.1996); *Uniq Computer Corp. v. United States,* 20 Cl.Ct. 222, 223 (1990). Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Rules of the Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48, 106 S.Ct. 2505. In deciding whether summary judgment is appropriate, it is not the court's function "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. 2505.

### II. Interpretation of the Contract

#### A. Standard of Review

 The court's analysis of the parties' competing interpretations of the contract must begin with the plain meaning of the

---

5. Vicari is claiming sixty-two days of delay, calculated as the difference between the date on which the Navy allowed Vicari to proceed to Phase B of the contract, March 16, 1999, and the originally-scheduled completion of Phase A of the contract, January 13, 1999. *See supra* part I.A.

6. Vicari has also requested reimbursement related to some delay costs that, according to the

parties, are presently the subject of a separate claim. The court agrees with the government that those costs are not properly before this court, and as such, the court will not consider them here. Accordingly, Vicari's request for $8,981 for work performed by Aquaterra Engineering is left for another proceeding.

contract itself. *Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed.Cir.1998). A contract must be read "in a manner that gives meaning to all its provisions and makes sense. Thus, if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'" *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996) (internal citations omitted).

 Whether a contract is ambiguous presents a question of law. *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed.Cir.1985). The court need only consider Vicari's competing interpretation of the contract if it finds that the specifications contained in the contract are ambiguous. *Community Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1578 (Fed.Cir.1993) (citing *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 427 F.2d 722, 725 (1970)). "Where a contract is not ambiguous, the wording of the contract controls its meaning and resort cannot be had to extraneous circumstances or subjective interpretations to determine such meaning." *Perry & Wallis*, 427 F.2d at 725 (citing *Duhame v. United States*, 127 Ct.Cl. 679, 119 F.Supp. 192, 195 (1954)). Further, "extrinsic evidence will not be received to change the terms of a contract that is clear on its face." *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir. 1988).

Guided by these principles, the court finds that the contract between the Navy and Vicari is plain on its face with regard to Vicari's claim for delay damages, and that the government properly denied Vicari's claim for such damages. However, there are facts in dispute regarding the amount of work performed by Vicari in providing geotechnical services later relied upon by the government, and a corresponding dispute regarding the

amount owed. As such, summary judgment is not appropriate and is denied in part concerning Vicari's claim for damages related to this work.

**B. Counts I and II**

In the first two counts of its complaint, Vicari alleges that the Navy breached its contract with Vicari when it refused to allow the contractor to proceed to Phase B of the construction project until March 16, 1999. The parties now agree that under the contract terms, Vicari would have been allowed to proceed when it *either* achieved the ½ inch settlement requirement *or* when it had accrued 120 day of settlement monitoring.[7] Vicari therefore argues that it should have been allowed to proceed to Phase B as early as January 3, 1999, when it alleges it completed the settlement monitoring, or by approximately January 8, 1999, when it alleges it had data to show it had achieved the ½ inch settlement requirement, or at the very latest on January 13, 1999, the "scheduled completion date" of Phase A.[8] Vicari thus claims sixty-two days of delay, calculated as the time between January 13, 1999, and March 16, 1999, the date on which the Navy finally allowed Vicari to proceed to Phase B of the contract.

In opposition, the government claims that the contract terms plainly justify the Navy's refusal to allow Vicari to proceed to Phase B of the contract because Vicari never achieved the ½ inch settlement requirement, nor did it satisfy the 120–day monitoring requirement prior to March 16, 1999.

**1. The ½ inch requirement**

Vicari bases its delay claim primarily on its contention that when the contract is read as a whole, it is plain that Vicari should have been allowed to proceed to Phase B of the

---

7. The government at one point in these proceedings argued that it was not even obligated to allow Vicari to proceed to Phase B of the contract on March 16, 1999, because it had the right to hold Vicari until it had completed 180 days' worth of monitoring. The court finds this reading is not supported, given the contract's provision of 180 days for the *entire* settlement process, a process which encompassed the monitoring program as just one component. Paragraph 1.4.2 provides: "Contractor shall schedule placement of wick drains, strip drains and fill place-

ment a minimum of 180 calendar days prior to the start of any foundation work in the indicated areas." Because the court finds that the monitoring program could not begin until the fill was in place, the government's contention that it could have required Vicari to monitor the settlement after fill placement for 180 days is inconsistent with the plain terms of this provision.

8. *See supra* note 5.

contract when the *rate* of settlement had slowed to less than ½ inch *per week.* Vicari asserts that it achieved this standard prior to January 13, 1999 (the scheduled completion date for Phase A), and thus, at the latest, Vicari should have been allowed to proceed to Phase B of the contract on that date.

To support this reading of the contract, Vicari contends that the contract specifications repeatedly refer to a "rate" of compaction, and thus Vicari was only obligated to achieve a ½ inch *rate* of settlement. Because the contract directed that biweekly readings of the settlement plates be taken, Vicari argues that as soon as two weeks' worth of data showed that the settlement rate had slowed to ½ inch, it should have been granted permission to proceed.

Vicari further argues that the Navy confirmed this interpretation on October 15, 1998, when the Navy's engineering subcontractor, Eustis, told Vicari that, "the duration of the surcharge will depend on the observed *rate* of consolidation as determined by evaluation of the data collected from the settlement plates and pore pressure transducers." (Emphasis added.)

In response, the government argues that the ½ inch contract specification required Vicari to demonstrate that total compaction at the end of the settlement process would equal ½ inch or less, and that Vicari never achieved this finite ½ inch compaction goal. Therefore, the government argues that the Navy was plainly within its rights to require Vicari to perform the full 120 days of settlement monitoring.

The government argues that the use of the term "rate" in section 1.5.1.1 of the contract and in Eustis' response to RFI 9 referred to the projected length of time it would take to meet the final ½ inch total compaction limit, and that the contract itself did not specify a specific compaction rate, or commit to a final timeline for compaction.

Moreover, the government argues that Vicari's interpretation of the contract is overly simplistic, and ignores the nature of the sophisticated monitoring program established in the contract. According to the government, in contrast to the simple subtraction

required in order to determine the rate of settlement as advocated by Vicari, the contract called for expert analyses of the plate data to determine when future settlement was expected to be ½ inch or less. According to the government, this analysis required that bi-weekly data to be plugged into asymptotic models in order to predict the final cumulative settlement expected at the work site. Since the geotechnical engineers' expert analyses using such calculations demonstrated that Vicari had not achieved the ½ inch compaction goal prior to March 16, 1999, the government argues that the Navy properly refused to allow Vicari to proceed to Phase B before that date (upon which Vicari was allowed to proceed given its satisfaction of the 120–day monitoring requirement).

The court agrees with the government regarding the proper interpretation of the ½ inch requirement. Vicari's interpretation is inconsistent with the plain words of the contract. Specification 1.3.4.2, titled "Settlement Plate Logs," states:

> Submit log to include settlement plate elevations at the beginning and upon completion of fill placement and weekly thereafter for a minimum of 120 days or until additional settlement is expected to be less than ½ inch.

And 1.5.1.1 reads as follows:

> The actual duration of the surcharge will depend on the observed rate of consolidation of the subsurface soils. Instrumentation used to monitor the surcharge should consist of settlement plates and pore pressure transducers. The Contractor is to retain a registered Geotechnical Engineer to monitor and evaluate data from these instruments. Settlement plates and pore pressure transducers are to be monitored on a bi-weekly basis *to provide sufficient data for evaluation. . . .* (Emphasis added.)

Clearly, the contract requires Vicari to achieve future expected settlement of a finite ½ inch (or to monitor for 120 days). There is nothing in the contract to suggest that the specification would be satisfied once a specific *rate* of settlement was achieved. To the contrary, the contract required Vicari to implement an elaborate dewatering and monitoring program to achieve the desired end.

The rate of settlement was certainly identified in the contract as the relevant means of *evaluating progress* toward the required result, but achieving a certain weekly rate of settlement was not part of the contract itself.

■ The court may not insert a term into the contract that simply is not there. "Contract language should be given its plain meaning without rewriting or varying terms of the contract." *Haehn Mgmt. Co. v. United States*, 15 Cl.Ct. 50, 59 (1988) (citing *Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed.Cir.1987)). Or, put more succinctly, "Courts cannot read into a contract that which is not there." *Southwest E & T Suppliers, Inc. v. American Enka Corp.*, 463 F.2d 1165, 1166 (5th Cir.1972). Since there is no "rate" requirement in the contract, Vicari's argument is refuted by the contract's plain terms.

Vicari's attempt to support its reading of the contract with the deposition testimony of two engineers—Kerwin Julien, the geotechnical engineer retained by Citywide to collect and analyze the settlement plate data, and its own expert engineer, Ralph Junius—is also unavailing. Vicari's suggestion that experts in the field would have understood the contract to mean that Vicari was only required to reach a certain rate of compaction is not supported.

■ It is well-recognized that trade usage and custom may be relied upon to find the proper meaning of a contract when the contract terms themselves are ambiguous. *Moore v. United States*, 196 U.S. 157, 166, 40 Ct.Cl. 513, 25 S.Ct. 202, 49 L.Ed. 428 (1905); *Haehn Mgmt.*, 15 Cl.Ct. at 59 (holding that trade usage and custom can be applied to an "undefined contract term"). However, the court may not rely on trade usage and custom to create an ambiguity where none exists. *R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572 (Fed.Cir.1990) ("Neither a contractor's belief nor contrary customary practice, however, can make an unambiguous contract provision ambiguous, or justify a departure from its terms."). Here, the contract is not ambiguous, and there are no "undefined" terms. As such, Vicari's reliance on the parol evidence of the engineers' deposition testimony is misplaced.

Moreover, a careful reading of the testimony of Julien and Junius reveals that they do not contend that an expert in geotechnical engineering would support Vicari's reading of the contract for expert reasons. For example, in the deposition conducted on November 3, 2000, Julien was asked to explain why he read paragraph 3.2.3 as requiring that readings of a "weekly rate" of settlement of less ½ inch would satisfy the specifications for the completion of Phase A. Julien responded:

Well, it says to, to survey the elevation of the settlement plate [sic] after installation and then weekly after completion of the structural fill and surcharge, and then any additional—and then keep monitoring it until the additional settlement is less than a half inch between readings. I just used the—just look at the whole paragraph and take it within its context, I guess, and made—I guess I made my own determination.

Julien does not state that his interpretation of the contract is based upon background principles of trade usage and custom in the geotechnical engineering field, but instead that he "made his own determination." Similarly, when asked in deposition whether it would be "entirely reasonable for the contractor to look at [paragraph 3.2.3] and conclude that he is looking to find a rate of settlement of less than one half inch per week?," Junius stated:

You know, I think it can be interpreted this way. And it does, it does—it would not surprise me if a contractor interpreted it this way, you know. I think it's, it's, you know, not what the engineers intended, but it's, it's so poorly worded that, you know, I, you know, I think it's a legitimate interpretation.

Since Vicari's reading of the contract is based on only the personal feelings of two engineers who simply opine that there might be an ambiguity in the relevant provisions, the engineers' testimony lacks any value in this court. *See Jowett, Inc. v. United States*, 234 F.3d 1365, 1369–70 (Fed.Cir. 2000) ("[A]ffidavits that those familiar with trade practices in the construction industry

would interpret the specifications differently are irrelevant, unless they identify a specific term that has a well-understood meaning in the industry and that was used in, or omitted from, the contract.").

The court's agreement with the government's view of the ½ inch provision is also not altered by Vicari's reliance on correspondence that passed between Vicari and Eustis during the contract performance period. Vicari alleges that its communications with Eustis verified that the proper specification was to achieve a ½ inch "weekly rate" of compaction. While it is true that in its March 15, 1999 report, Eustis did state that the "anticipated rate of settlement is different than initially predicted" (as quoted extensively by Vicari), in that report Eustis also expressly discussed the expected interplay *between* the measured weekly rate of settlement and the final magnitude of the settlement expected to occur as a result of Phase A:

1. "The difference in the measured and anticipated rates of consolidation may be due to the foundation soils initially being slightly underconsolidated. If this is the case, the magnitude of total settlement may be increased."

2. "While the current magnitude of anticipated settlement is consistent with our original estimates, the rate of settlement has been different than anticipated and the rate of observed settlement has not begun to decrease. As shown with the modified theoretical settlement curve on Enclosure 1, a decreased rate would appear as an asymptotic level of cumulative settlement. This level has not been reached with the observed settlements."

3. "Our evaluation of the data indicate [sic] approximately 1 to 2 inches of residual settlement could occur if the surcharge is removed at this time. Therefore, we recommend the surcharge remain in place and data continue to be obtained on a biweekly basis and forwarded for our review. We will provide evaluation of the surcharge as data are accumulated."

These three statements plainly demonstrate that Eustis consistently differentiated, for engineering purposes, between the "rate" of settlement and the "magnitude of total settlement." Determination of the "rate of weekly settlement" was necessary to calculate the "magnitude of total settlement" to be expected as a result of the work performed in Phase A, but the weekly rate was not *itself* the specification. The contract's ½ inch specification would only have been met when the settlement data, plugged into the proper engineering formulas, indicated that the total magnitude of future settlement was expected to be "less than ½ inch."

For the same reason, Vicari's reliance on Eustis' response to RFI 9 is also unpersuasive. The mere fact that Eustis used the term "rate" in its response does not prove conclusively that the proper specification was itself a rate. The two concepts cannot be separated in an engineering project such as this one; settlement, by definition, happens gradually, and the rate at which that settlement occurs dictates how much settlement there will ultimately be, and when that settlement process will be complete. As described above, incremental settlement rate is a predictor for the magnitude of total settlement at the end of such a process.

■ For all these reasons, the court finds that, as a matter of law, the contract plainly called upon Vicari to continue monitoring and compaction until less than ½ inch of future total settlement was expected, and that Vicari's allegation that it fulfilled that requirement when it achieved a ½ inch weekly rate of settlement is not supported. Accordingly, the government is entitled to summary judgment on its contention that Vicari did not meet the compaction goal of "less than ½ inch" of settlement as set forth in the specifications, and thus the government did not delay Vicari by refusing to allow the contractor to proceed to Phase B by January 13, 1999 on such grounds.

### 2. The 120–day requirement

■ In addition, the court also finds that Vicari failed to satisfy the 120–day monitoring requirement prior to March 16, 1999, and therefore the government correctly refused

to allow Vicari to proceed to Phase B until that time.

According to the government, under the plain language of the contract, the 120–day clock for monitoring the settlement process did not begin to run until Vicari took the first settlement plate reading *with the surcharge completely installed.* It is undisputed that Vicari's subcontractor recorded the first reading with the surcharge in place on November 16, 1998.[9]

In opposition, Vicari argues that the government has misread the contract and that the 120–day requirement was actually satisfied as of January 3, 1999. Vicari argues that paragraph 1.3.4.2 should be read as having required the government to give the contractor permission to proceed to Phase B 120 days following the installation of the wick drains, which happened on September 5, 1998. According to Vicari, the monitoring program began with the installation of the wick drains, and *not* with the first reading of the settlement plate data after the surcharge was in place.

In the alternative, Vicari argues that it satisfied the temporal requirements of the contract by the latest on February 16, 1999, which is 120 days after the first settlement plate reading was taken on October 19, 1998. (It is this reading that the government argues was only a "zeroing" reading, *see* note 9 *supra.*) Vicari points to the following language of paragraph 1.3.4.2 to support this interpretation: "Submit log to include settlement plate elevations *at the beginning and upon completion of fill placement and weekly thereafter.*" Vicari reads "at the beginning" as the trigger that starts the 120–day clock, and not "upon completion of fill placement."

The court finds each of Vicari's arguments unpersuasive, and again agrees with the government that the contract is plain on its face. Vicari's monitoring obligations are set forth in three contract specifications:

1.3.4.2 Settlement Plate Logs

Submit log to include settlement plate elevations *at the beginning and upon completion of fill placement and weekly thereafter for a minimum of 120 days* or until additional settlement is expected to be less than ½ inch. (Emphasis added.)

1.5.1.2 Settlement Plates

A minimum of 6 settlement plates are [sic] to be installed at each building location. Data collected from the settlement plates will be used to verify or revise the estimated rate of settlement. Settlement plates need to be installed by the Contractor at the Geotechnical Engineer's direction with *zero readings established by the Geotech prior to placement of the preload fill.* (Emphasis added.)

3.2.3 Settlement Monitoring

After site preparation and wick drain placement and prior to surcharge and placement, install settlement plates as prefiously [sic] indicated.... The Owner's Geotechnical Engineer will *survey the elevation of all settlement plates immediately after installation (immediately after wick drain placement), and weekly after completion of structural fill and surcharge. Upon completion of fill placement, the site shall be allowed to consolidate until the settlement plate data indicates additional settlement will be less than ½ inch.* Contractor shall schedule a minimum of 180 days for this process. Do not proceed with foundation work in these areas until the Geotechnical Engineer has verified in writing that the consolidation process is complete and the approval of the Contracting Officer is obtained. (Emphasis added.)

When read together, it is clear to the court that while one instrument reading had to be taken before the surcharge was placed on top of the settlement plates as a "zeroing" read-

---

9. According to the government, an earlier reading recorded by the subcontractor on October 19, 1998, a data reading taken by Vicari "at the beginning"—when the settlement plates were installed but not yet covered by the surcharge—was merely a "zeroing" reading taken pursuant to section 1.5.1.2. Paragraph 1.5.1.2 provided that, "Settlement plates need to be installed by the Contractor at the Geotechnical Engineer's direction with zero readings established by the Geotech prior to placement of the preload fill."

ing, the measurement of the rate of settlement could not technically begin until the surcharge was in place. It is after the surcharge was installed on top of all the settlement plates that the 120–day monitoring clock began. As paragraph 3.2.3 dictates, "Upon completion of fill placement, the site shall be allowed to consolidate until the settlement plate data indicates additional settlement will be less than ½ inch." In order to read paragraph 3.2.3 consistently with paragraph 1.3.4.2, the starting point for the 120 days of monitoring must be "upon the completion of fill placement."

This conclusion is bolstered by the following provisions within paragraph 3.2.3:

> The Owner's Geotechnical Engineer will survey the elevation of all settlement plates immediately after installation (immediately after wick drain placement), and weekly after completion of structural fill and surcharge. *Upon completion of fill placement, the site shall be allowed to consolidate* until the settlement plate data indicates additional settlement will be less than ½ inch. *Contractor shall schedule a minimum of 180 days for this process....*
> (Emphasis added.)

The court finds that the 180–day provision in paragraph 3.2.3 plainly refers to the estimated duration of the *entire* settlement monitoring process, from wick drain installation to the end, and not from either of the starting points advocated by Vicari. The court's reading is plainly supported by another provision of the contract, paragraph 1.4.2, "Wick Drains," which reads in part: "Contractor shall schedule placement of wick drains, strip drains and fill placement a minimum of 180 calendar days prior to the start of any foundation work in the indicated areas." Under Vicari's interpretation of the contract, the Navy would have been *required* to grant permission to Vicari to proceed to Phase B 120 days from either the wick drain installation date (September 5, 1998) or from the zeroing reading date (October 19, 1998). This interpretation is plainly contradicted by the above-quoted provisions.

Moreover, Vicari's various interpretations of the time limits in the contract make little sense. In pointing to the 180–day provision

of paragraph 3.2.3 or the 210–day timeline for completion of Phase A established by the government at the outset of the contract, Vicari erroneously assumes that those dates were included to be binding on the government. To the contrary, those dates were included in the contract to bind Vicari, and did not obligate the government in any way. Aside from providing a projected timeline for the project, the Navy could not control how diligently Vicari decided to complete its tasks while performing Phase A of this contract.

For example, if Vicari's interpretation of and reliance upon the 210–day or 180–day timelines was played out to its logical conclusion, under 1.3.4.2 for example, Vicari could have waited sixty days between installing the settlement plates and installing the surcharge, yet *still* insisted that it was entitled to proceed to Phase B of the contract 120 days after the installation of the settlement plates under paragraph 1.3.4.2, despite having been able to collect only sixty days of monitoring data. Likewise, following one of its alternative theories, Vicari could have waited sixty days before making its first Phase A submittal, allowed sixty more days to pass before installing the settlement plates, and waited yet another sixty days before placing the surcharge on the site, yet claimed nonetheless that it was entitled to proceed to Phase B 210 days after the notice to proceed was issued on June 5, 1998, despite having allowed fewer than 30 days for the settlement process. This is plainly absurd. The reason the government includes such deadlines in its contracts is to bind the *contractor* to estimated work completion schedules, not to bind itself in any way.

Because Vicari did not complete the 120 days of required monitoring until March 16, 1999, as a matter of law the government did not delay Vicari's performance by denying permission to proceed to Phase B until that date. For all the reasons discussed above, the court finds that Vicari failed to satisfy both the 120–day requirement and the ½ inch requirement contained in paragraph 1.3.4.2 prior to March 16, 1999, and as such, Vicari is not entitled to delay damages on these counts of its complaint.

## C. Count III

The second part of this dispute between the Navy and Vicari centers on the amount the Navy owes Vicari for providing a geotechnical engineer who performed certain data collection and analysis services pursuant to section 3.2.3 of the contract. Vicari argues that under the contract, subsequent to a pre-award contract modification, both the contractor and the owner (the government) were required to provide some geotechnical services. In addition to section 1.5.1.1 of the contract which requires the contractor to "retain a registered Geotechnical Engineer to monitor and evaluate data from the [monitoring] instruments," Vicari points to paragraph 3.2.3 of the contract, which states in relevant part: "The *Owner's* Geotechnical Engineer will survey the elevation of all settlement plates immediately after installation (immediately after wick drain placement), and weekly after completion of structural fill and surcharge." (Emphasis added.) According to Vicari, because the contract plainly required that the monitoring and data evaluation duties related to the settlement monitoring process be shared by Vicari and the government, and because the government failed to provide its share of such services, Vicari is entitled to an equitable adjustment of the contract price.

For its part, the government does not dispute that under paragraph 3.2.3 it was obligated to provide some geotechnical services, but argues instead that the two paragraphs cited above, 1.5.1.1 and 3.2.3, created a patent ambiguity in that they required both the contractor and the government to provide geotechnical services. According to the government, this difference creates a patent ambiguity in the contract, and because Vicari did not inquire about the correct reading of the contract, the government cannot be held liable for any damages associated with the geotechnical services provided by Vicari.

In the alternative, the government argues that even if the government was required to provide some geotechnical services, its failure to do so is non-compensable since Vicari was also required to provide such services. According to the government, Vicari would have had to provide the same services whether or not the government performed its obligation, making compensation inappropriate.

The court agrees with Vicari, and finds that the government was obligated to undertake its own geotechnical evaluations but elected not to do so. Instead, it elected to rely upon Vicari's data and thus it saved the resources associated with the data gathering and analysis efforts. First, there is no ambiguity in the contract. "It is well settled in this court that 'an ambiguity is patent when there is an obvious error in drafting, a gross discrepancy, or an inadvert but glaring gap.'" *H.B. Zachry Co. v. United States*, 28 Fed.Cl. 77, 81 (1993) (quoting *Fry Communications, Inc. v. United States*, 22 Cl.Ct. 497, 504 (1991) (internal quotations omitted)). While the government has stated that it was a drafting error that resulted in the alleged ambiguity requiring both Vicari and the government to do some geotechnical monitoring, there is nothing facially inconsistent between paragraphs 1.5.1.1 and 3.2.3. In supervising the work of contractors, the government often performs its own tests and data analysis to confirm the contractor's conclusions. Therefore, the simple requirement that both parties perform geotechnical work would not have put the contractor on notice that a drafting error had been made. *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed.Cir.2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."). Because the court finds that the alleged drafting error is in no way plain on the face of the contract, the contract is not ambiguous.

Second, it is clear that the government and its engineer, Eustis Engineering, relied on the monitoring and analysis performed by Vicari's subcontractor Kerwin Julien. For example, Eustis based its March 15, 1999 report on both the latest set of data obtained at the instruments and on "Report # 2, Settlement Monitoring, dated 1 March 1999 and prepared by Julien Engineering and Consulting." In the absence of its own geotechnical data, the government relied al-

most exclusively on the information provided by Vicari. For that, Vicari deserves compensation.

Although the court agrees with Vicari that the government should share in the costs for the monitoring and analysis of the settlement plate data, the government has raised objections to the amount of damages claimed by Vicari because the government disputes Vicari's tally of the hours worked by Julien. Because of this dispute, the court cannot grant Vicari summary judgment on Count III. The court agrees that the cost of both the monitoring and the analysis services provided by Julien and relied upon by the government should be shared by the parties. But the appropriate total amount that will be split must be verified. The parties should endeavor to resolve this matter on their own. However, in the event that the parties cannot resolve this quantum issue, they shall report to the court with a proposal for further proceedings to resolve the issue.

### III. Conclusion

Regarding Counts I and II of Vicari's complaint, the court **GRANTS** the government's motion for partial summary judgment and **DENIES** Vicari's cross motion for summary judgment. Regarding Count III of Vicari's complaint, Vicari's motion for summary judgment is granted in part and denied in part: **GRANTED** as to liability, but **DENIED** as to quantum. The parties shall contact the court by **Tuesday, December 18, 2001,** with either their proposed resolution of the quantum issue, or with a recommendation for how to reach final resolution of the quantum issue.